IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>15375 MEMORIAL CORPORATION, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 06-10859 (KG)<br><br>Jointly Administered |
| BEPCO, L.P., f/k/a<br>Bass Enterprises Production Company,<br><br>Appellant,<br><br>v.<br><br>15375 MEMORIAL CORPORATION, *et al.*,<br><br>Appellees and Cross-Appellants. | Civ. A. No. 08-313-SLR<br><br>(Consolidation of civil actions 08-313, 314, 318, 319, 321, 322, 325 and 326) |

**MEMORANDUM ORDER**

At Wilmington this 27th day of January, 2009, having reviewed the appeals filed by BEPCO, L.P. f/k/a Bass Enterprises Production Company ("Bepco"); 15375 Memorial Corporation ("Memorial") and Santa Fe Minerals, Inc. ("Santa Fe" and, collectively, "Debtors"); and the GlobalSantaFe Entities[1] ("GSF Entities"), and the papers filed in connection therewith;

IT IS ORDERED that the appeal of Bepco is granted and the appeals of Debtors

[1]The GlobalSantaFe Entities consist of GlobalSantaFe Corporation ("GSF Corp."), Entities Holding, Inc. ("EHI"), and GlobalSantaFe Corporate Services, Inc. ("GSFCSI")

and the GSF Entities are denied. The decisions and the related orders of the
bankruptcy court dated February 15, 2008 (Bk. D.I. 291 and 292, respectively), and
April 16, 2008 (Bk. D.I. 323 and 324, respectively), are reversed, for the reasons set
forth below.

1. **Standard of review.** This court has jurisdiction to hear an appeal from the
bankruptcy court pursuant to 28 U.S.C. § 158(a). In undertaking a review of the issues
on appeal, the court applies a clearly erroneous standard to the bankruptcy court's
findings of fact[2] and a plenary standard to that court's legal conclusions. *See Am. Flint
Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). With
mixed questions of law and fact, the court must accept the bankruptcy court's "finding of
historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of
the [bankruptcy] court's choice and interpretation of legal precepts and its application of
those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Communications,
Inc.*, 945 F.2d 635, 642 (3d Cir. 1991) (citing *Universal Minerals, Inc. v. C.A. Hughes &
Co.*, 669 F.2d 98, 101-02 (3d Cir. 1981)). The district court's appellate responsibilities
are further informed by the directive of the United States Court of Appeals for the Third
Circuit, which effectively reviews on a *de novo* basis bankruptcy court opinions. *See In
re Hechinger*, 298 F.3d 219, 224 (3d Cir. 2002); *In re Telegroup*, 281 F.3d 133, 136 (3d
Cir. 2002).

2. **Question presented.** Do Debtors' Chapter 11 petitions meet the good faith

---

[2]"A factual finding is clearly erroneous when 'the reviewing court on the entire
evidence is left with the definite and firm conviction that a mistake has been
committed.'" *In re CellNet Data Sys., Inc.*, 327 F.3d 242, 244 (3d Cir. 2003) (citing
*United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

requirement?[3]

3. **Background facts.**[4] Santa Fe was a Wyoming corporation until it dissolved in 2000 pursuant to a non-judicial Wyoming statutory dissolution procedure. (D.I. 1, ex. A at 6) Santa Fe has no office, officers, directors or employees and engages in no business.[5] Memorial, a Delaware corporation, is a holding company that has no office or employees and engages in no business other than to act as the sole shareholder of Santa Fe.[6] (*Id.*) GSF Corp., a Cayman Islands corporation, is the ultimate parent in the GlobalSantaFe family of companies,[7] which includes Debtors, EHI,[8] and GSFCSI.[9] (*Id.*

---

[3]Bepco, the Debtors, and the GSF Entities present numerous questions on appeal (*see, e.g.*, D.I. 2 and D.I. 3), but resolving the good faith question in Bepco's favor, as the court does here, disposes of the bankruptcy cases and renders moot all other questions.

[4]The court finds no clear error in the bankruptcy court's findings of fact and adopts them for purposes of this memorandum order.

[5]Prior to dissolution, Santa Fe's business was oil and gas exploration and related activities. (D.I. 1, ex. A at 6) By December 2000, all of Santa Fe's assets (or the proceeds therefrom) had been upstreamed from Santa Fe to GSF Entities or Debtors' other affiliates; at least $500,000 went to EHI, though Memorial's 2000 federal tax return suggests that Santa Fe's distribution to Memorial upon dissolution was $772,000. (*Id.* at 12, 21, 25) As of the date Santa Fe filed its Chapter 11 petition, its dissolution was not complete because two years had not yet passed from the date Santa Fe published notice of its dissolution as required by Wyoming law. (*See id.* at 12) Although it could have done so at an earlier date, Santa Fe published notice on August 4, 2006. (*Id.*)

[6]Memorial voluntarily dissolved in 2001, but that dissolution was later revoked in June 2004 "under the advice of counsel in litigation." (D.I. 1, ex. A at 6)

[7]The GSF Entities are one of the world's largest offshore oil and gas drilling contractors. (D.I. 1, ex. A at 7) In 2006, GSF Corp. reported net income on a consolidated basis in excess of one billion dollars. (*Id.* at 7-8)

[8]EHI is a wholly-owned, direct subsidiary of GSF Corp. and is the parent and sole shareholder of Memorial. (D.I. 1, ex. A at 8) EHI is a holding company with no

at 7-8)

4. David Faure, identified as Debtors' representative in connection with these cases, is vice president and assistant secretary for Memorial. (*Id.* at 8-9) He is also vice president and assistant secretary for EHI and is vice president, assistant general counsel, and assistant secretary for GSFCSI.[10] (*Id.*) In his capacity as a GSFCSI employee, Faure has provided and continues to provide legal services to EHI, primarily assisting it with defensive litigation. (*Id.*) Faure's superior is James McCullough, the senior vice president and general counsel for GSF Corp. (*Id.* at 9) Faure reports to and takes direction from McCullough; before Debtors filed the Chapter 11 petitions underlying this appeal, Faure sought legal counsel from McCullough relating to Memorial and consulted with McCullough regarding Debtors filing their Chapter 11 petitions. (*Id.*) McCullough authorized the filing of the Chapter 11 petitions.[11] (*Id.*)

5. Bepco, a limited partnership converted from a Delaware corporation, is (along with Santa Fe) in the chain of title to a mineral lease obtained in 1938 (the "1938

---

employees but has several additional subsidiaries with assets of material value. (*Id.*)

[9]GSFCSI is a wholly-owned, indirect subsidiary of GSF Corp. and is the principal provider in the United States of corporate services to other entities in the GSF Corp. family. (D.I. 1, ex. A at 8) GSFCSI, along with other affiliates and outside vendors, provides Memorial with all support services, including, but not limited to, legal, tax, and purchasing. (*Id.* at 6)

[10]Each of Memorial's officers and directors is also an officer of at least one other company in the GSF Corp. family. (D.I. 1, ex. A at 10) For example, all of Memorial's officers are also officers of EHI and GSFCSI, while all of Memorial's directors are also officers of GSF Corp. (*Id.* at 10-11)

[11]Faure testified that filing a lawsuit against GSF Corp. on Debtors' behalf to facilitate the return of "upstreamed" funds would jeopardize his job. (D.I. 1, ex. A at 10)

Mineral Lease") on certain parcels of land (the "Tebow property") in Avoyelles Parish, Louisiana. (*Id.* at 11, 13) Through a series of mergers completed during July and August 1982, Santa Fe became obligated to Bepco under the 1938 Mineral Lease. (*Id.* at 14) From 1974 to 1990, Santa Fe and its predecessor-in-interest operated oil wells on the Tebow property. (*Id.*)

6. On April 18, 2005, various plaintiffs (the "Tebow plaintiffs") sued Bepco, Santa Fe, and other defendants, alleging that defendants' disposal of water produced from oil wells had contaminated soil and water on the Tebow property (the "Tebow suit"). (*Id.* at 14) The Tebow plaintiffs' expert reports showed that the contamination was worst in the "East Pit" portion of the property. (*Id.* at 14-15) Santa Fe knew that the expert reports showed that it, not Bepco, was to blame for contaminating the East Pit. (*Id.* at 16) Debtors knew that the Tebow plaintiffs were seeking at least $189 million for remediation of the East Pit contamination. (*Id.*) Debtors also knew from the Tebow plaintiffs' complaint that Santa Fe would avoid liability in the Tebow suit if Santa Fe filed for bankruptcy. (*Id.* at 17)

7. In June 2006, the Tebow plaintiffs and Bepco informed Santa Fe that they would pursue Santa Fe's parent entities. (*Id.* at 22-23) On August 8, 2006, Memorial, through Faure, executed a demand note by which it received from EHI a revolving credit line of up $500,000 in exchange for agreeing that "it [was] not a single business enterprise with [the GSF Entities]" and that it would defend and indemnify EHI from any claims relating to Santa Fe's operations. (*Id.* at 23) On August 10, 2006, EHI

advanced $100,000 to Memorial.[12] (*Id.* at 40)

8. Roughly one week later, on August 16, 2006, with trial in the Tebow suit set to start on October 11, 2006, and with trial preparations mostly concluded,[13] Debtors filed their Chapter 11 petitions. (*Id.* at 17) On August 17, 2006, consistent with their complaint, the Tebow plaintiffs dismissed Santa Fe from the Tebow suit without prejudice. (*Id.*) Bepco remained a defendant and ultimately settled the Tebow suit, agreeing to pay $20 million to the Tebow plaintiffs and to perform certain remedial measures on the Tebow property in exchange for being assigned all of the Tebow plaintiffs' claims for property damage.[14] (*Id.* at 17-19)

9. At the time they filed their petitions, Debtors knew of three lawsuits pending against either Santa Fe or Memorial: the Tebow suit against Santa Fe; a suit filed in 2001 in Oklahoma state court principally against FDC Disposal, Inc., concerning improper operation of a commercial disposal facility in which Santa Fe was one of many defendants who had disposed of materials at the facility (the "Ellison suit");[15] and a

[12]Repayment of that debt is deeply subordinated. (D.I. 1, ex. A at 23) Memorial had no cash before it executed the demand note and, given their financial and operational status, Debtors could not obtain funding from any source other than the GSF Entities. (*Id.* at 25)

[13]Fact discovery had closed on June 15, 2006, and expert discovery had closed on August 11, 2006. (D.I. 1, ex. A at 17) Both Bepco and Santa Fe had participated in numerous depositions. (*Id.*)

[14]Bepco has performed in accordance with the settlement agreement, including paying $20 million to the Tebow plaintiffs. (D.I. 1, ex. A at 19)

[15]Santa Fe asserted a right of indemnity against co-defendant BP Amoco Corporation in the Ellison suit, and BP Amoco Corporation was defending the Ellison suit on Santa Fe's behalf. (D.I. 1, ex. A at 26) Santa Fe incurred no material defense

personal injury suit in California state court naming Memorial as a defendant relating to its past ownership of an allegedly contaminated site in Alhambra, California (the "Harris suit").[16] (*Id.* at 25-27) Debtors were also aware of two asbestos-related lawsuits in California state court pending against predecessors of, *inter alia*, Memorial and GSF Corp. (the "Sinz suit" and the "Troia suit"). (*Id.* at 27-28) Debtors testified that they were also concerned about potential future liability in so-called oilfield legacy lawsuits, as well as potential future liability arising out of then-active investigations of Memorial by the EPA and California Water Board. (*Id.* at 43-44)

10. At the time Debtors filed their petitions, Santa Fe was insured – but did not know that it was insured – under multiple insurance policies, some of which potentially cover the asbestos claims from the Sinz and Troia suits and some of which potentially cover the contamination claims from the Tebow suit.[17] (*Id.* at 31-34, 37) Debtors came to know of this insurance through Faure's and GSFCSI's work between October 2006 and May 2007 reviewing over 250 boxes' worth of insurance policies.[18] (*Id.* at 34-35) Faure and GSFCSI undertook this review for the benefit of the entire GSF Corp. family. (*Id.* at 35) The goal of the insurance review was to compile a database of insurance

---

costs or expenses in the Ellison suit and was dismissed from the suit shortly after having filed its Chapter 11 petition. (*Id.*) The Ellison suit settled in February 2007 without Debtors' participation or contribution. (*Id.*)

[16]Neither Debtor has hired counsel or incurred material expenses in defending the Harris suit. (D.I. 1, ex. A at 27)

[17]Prior to filing their petitions, Debtors did not have the financial ability to conduct a review of their insurance portfolio. (D.I. 1, ex. A at 34)

[18]Had Debtors retained an outside consultant to conduct its insurance review, it would have cost between $300,000 and $400,000. (D.I. 1, ex. A at 36)

policies that could be reviewed as claims came up against any GSF Corp.-related entity, whether it be Debtors or others.[19]  (*Id.*)

11.  At the time Debtors filed their petitions, their only non-insurance assets, besides the cash from EHI, were certain choses in action.  (*Id.* at 40)  Santa Fe claimed a right to a $60,000 payment from Conoco pursuant to a class action settlement and was entitled to recover $21,000 of escheated funds from the State of Texas.  (*Id.* at 40-41)  Santa Fe also claimed a right, potentially, to funds distributed pursuant to a pooling order from the State of Oklahoma that relates to an interest Santa Fe might have had, though Faure could confirm neither the origin nor the value of Santa Fe's right.[20]  (*Id.* at 41-42)  Memorial had an inter-company receivable claim against an affiliate in the amount of $5,722 arising out of a tax refund.  (*Id.* at 41)  Both Debtors claimed a right to indemnity and contribution in the Tebow and Ellison suits, as well as the right to sue the GSF entities on alter ego, veil piercing or single business purpose theories, though Faure has testified that such claims do not exist.  (*Id.* at 41-42)

12.  Debtors filed their Chapter 11 petitions in part because they were concerned that, with Santa Fe's dissolution incomplete due to its failure to earlier publish notice,

---

[19]Approximately 600 insurance policies were identified as potentially providing coverage of claims against Debtors.  (D.I. 1, ex. A at 35)  Insurers have been – and are still being – notified with respect to coverage of the Sinz, Troia, and Tebow claims.  (*Id.*)  GSFCSI continues to investigate additional potential insurance coverage.  (*Id.*)  Issues still to be determined with respect to the insurance include coverage, retroactive premiums, deductible and/or aggregate loss amounts, profit commissions, aggregate limits, and duties of cooperation.  (*Id.* at 39-40)

[20]Santa Fe originally listed among its assets a claim against Memorial.  Santa Fe later omitted this claim, though Faure subsequently testified that Santa Fe has a claim against Memorial for approximately $500,000.  (D.I. 1, ex. A at 42)

they would not be able to successfully assert the "dissolution defense" in litigation. (*Id.* at 42-43) Debtors also sought to avoid piecemeal litigation with a geographically disparate group of parties over a possibly finite pool of assets and to obtain the certainty and efficiency of a single ruling on the dissolution defense. (*Id.* at 43-44) Nevertheless, the Tebow suit was the principal factor in Debtors' filing for bankruptcy. (*Id.* at 44) Moreover, Debtors sought, by filing for bankruptcy, to cut off the GSF Entities' potential future exposure on claims made against the Debtors, including claims made against the GSF Entities in litigation.[21] (*Id.* at 22)

13. **Analysis.** "Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith . . . ." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004). Debtors "bear[ ] the burden of establishing good faith." *Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*, 324 F.3d 197, 211 (3d Cir. 2001). "Whether the good faith requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine 'the totality of the circumstances' and determine 'where a petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'" *Integrated Telecom*, 384 F.3d at 118 (quoting *In re SGL*

[21]Debtors have acted in bankruptcy to benefit their estates by: (a) asserting the automatic stay to limit the estates' involvement in non-bankruptcy litigation; (b) facilitating their dismissal as defendants from the Tebow, Ellison, Harris, Sinz, and Troia suits and centralize these claims in the bankruptcy court; (c) establishing a bar date to set the number of claims and perfected Santa Fe's dissolution, thereby creating a known universe of claims; (d) analyzing and challenging Bepco's claims against Debtors; (e) inventorying and analyzing potentially applicable insurance policies and finding policies that appear to provide coverage for the Tebow, Sinz, and Troia claims; (f) communicating with insurers; (g) negotiating and proposing a settlement with the GSF Entities through which Debtors would obtain, *inter alia*, over $1 million and continued cooperation in asserting insurance rights; (h) formulating a joint liquidation plan; and (k) continuing to manage and search for assets. (D.I. 1, ex. A at 58-59)

*Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999)).

14. Two questions relevant to the good faith inquiry are: "(1) whether the petition serves a valid bankruptcy purpose, *e.g.*, by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage." *Id.* at 119-20. With respect to the first question, since Debtors are not preserving going concerns, the court focuses on whether Debtors' petitions "might reasonably have 'maximiz[ed] the value of the bankruptcy estate[s,]" that is, whether the petitions preserve "some value that otherwise would be lost outside of bankruptcy." *Id.* at 120. With respect to the second question, "[a]s a general rule where . . . the timing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith." *SGL Carbon*, 200 F.3d at 165 (quoting *In re HBA East, Inc.*, 87 B.R. 248, 259-60 (Bankr. E.D.N.Y. 1988).

15. The bankruptcy court erred in concluding that Debtors had met their burden of proving good faith. First, the record does not support the conclusion that Debtors' petitions have captured value for the estates that otherwise would have been lost. There is no indication that the cash, the Conoco settlement payout, the escheated funds from the State of Texas, the inter-company receivable, the pooling funds from the State of Oklahoma, the indemnity rights, the alter ego claims against the GSF Entities, and even the insurance would not be just as valuable – and just as accessible – outside of bankruptcy. With respect to the insurance assets in particular, while it is true that Debtors did not discover these assets or reach out to insurers until after filing for

bankruptcy, it was not the bankruptcy that made these things possible. Rather, it was the resources from GSFCSI, and nothing in the record suggests that Debtors could not have sought, and GSFCSI could not have provided, these resources outside of Debtors' bankruptcy. Indeed, given that Faure and GSFCSI conducted the insurance review for the benefit of all GSF Corp.-related companies, the record suggests the contrary. Debtors' petitions did not maximize the value of Debtors' estates and, therefore, did not serve a legitimate bankruptcy purpose.

16. Second, the record supports the conclusion that Debtors' primary objective in filing the petitions was to gain a tactical advantage in litigation. The "principal factor" in Debtors' filing their petitions was the Tebow suit. Debtors knew that Santa Fe bore significant risk of being found liable for the contamination on the Tebow property. By filing, Debtors knew they would secure Santa Fe's dismissal and the automatic stay, which would prevent Bepco from following through with its announced plan to pursue alter ego claims – potentially worth $189 million – against the GSF Entities. These facts, along with the fact that discovery was complete and trial was imminent at the time Debtors filed, lead the court to conclude that Debtors filed these petitions as a litigation tactic.[22]

17. The court also notes that Debtors' desire to avail themselves of bankruptcy protections cannot establish good faith. *Integrated Telecom*, 384 F.3d at 128. "Given

[22]The court also notes that Debtors' proffered rationale for filing bankruptcy – avoiding piecemeal litigation in disparate fora, compensating for the weakness of its "dissolution defense," protecting GSF Entities from potential future exposure on claims made against Debtors – would have justified filing bankruptcy at some earlier date irrespective of the Tebow suit. It is telling, however, that Debtors did not file until faced with the significant risk of liability in the Tebow suit.

the truism that every bankruptcy petition seeks some advantage offered in the [Bankruptcy] Code, any other rule would eviscerate any limitation that the good faith requirement places on Chapter 11 filings." *Id.* With respect to Debtors' seeking and using the automatic stay, the court in *Integrated Telecom* noted that "courts universally demand more of Chapter 11 petitions than a naked desire to stay pending litigation," adding:

> The protection of the automatic stay is not *per se* a valid justification for a Chapter 11 filing; rather, it is a consequential benefit of an otherwise good faith filing. A perceived need for the automatic stay, without more, cannot convert a bad faith filing into a good faith one.

*Id.* (quoting *HBA East*, 87 B.R. at 262) Likewise, Debtors' seeking to efficiently distribute their assets cannot establish good faith.[23] *See id.* at 126 (good faith inquiry precedes and is independent from distribution; the fact that Chapter 11 provided an efficient distribution of assets did not evidence good faith where the efficient distribution did not also maximize estate's value). Finally, Debtors' filing a liquidation plan cannot establish good faith. As with distributions, the plan itself must evidence good faith, *i.e.*, it "must serve a valid bankruptcy purpose." *Id.* at 120 n.4. Because Debtor's plan is not confirmable (D.I. 31, tab 32 at 8), the court concludes that Debtors' plan cannot establish good faith.

18. The bankruptcy court interpreted *Integrated Telecom* as suggesting that filing a Chapter 11 petition to avoid "inchoate" claims is evidence of good faith, *id.* (citing

---

[23]Neither can a desire to efficiently dissolve establish good faith; dissolution must be effectuated under state law, since the Bankruptcy Code does not provide for dissolution of corporations or partnerships. *Integrated Telecom*, 384 F.3d at 126 ("Dissolution . . . is not an objective that can be attained in bankruptcy.").

*Integrated Telecom*, 384 F.3d at 127), and found that Debtors faced inchoate claims from which Chapter 11 petitions would protect, thus evidencing Debtors' good faith. Even accepting that as true, however, the court is still not persuaded, considering the totality of the circumstances, that Debtors filed their petitions in good faith. Not only were Debtors' filings motivated by litigation but, as the bankruptcy court found, they were also motivated by a desire to protect the GSF Entities – and their assets – from liability. Indeed, the record suggests that the GSF Entities used the Debtors and their bankruptcy filings to shield themselves from potential liability. First, before Debtors had even filed their petitions, Debtors and EHI executed the demand note in which EHI offered a line of credit to Memorial – a virtually defunct company – in exchange for Memorial's declaration that it was not a single business entity with the GSF Entities and would indemnify EHI with respect to Santa Fe's activities. Second, the GSF Entities were inextricably entangled, through common employees and McCullough's counsel and approval, in Debtors' decision to file their petitions; Debtors' lack of independence in deciding to file bankruptcy is further suggested by Faure's testimony that his job would be in jeopardy if he were to have Debtors pursue alter ego claims against GSF Entities. On this record, the court concludes that Debtors filed their petitions more to protect the GSF Entities than to serve a legitimate bankruptcy purpose.

19. **Conclusion**. Examining the facts in totality, the court concludes that Debtors' petitions fall much closer to "patently abusive" than to "clearly acceptable" on the good faith spectrum and, thus, do not satisfy the good faith requirement. Accordingly, the court reverses the decisions and the related orders of the bankruptcy court dated February 15, 2008, and April 16, 2008, and remands the case (as

consolidated) to the bankruptcy court to be dismissed.  All other pending motions are denied as moot.

United States District Judge